## YOUNG et al. v. WHITAKER.

### No. 2438.    Decided July 19, 1915.    (150 Pac. 972.)

1. BROKERS—RIGHT TO COMPENSATION—SUFFICIENCY OF EVIDENCE.
   In an action by real estate brokers for a commission, evidence
   *held* to sustain findings that the sale was not procured by plain-
   tiffs.    (Page 478.)

2. BROKERS—RIGHT TO COMPENSATION — EMPLOYMENT OF SEVERAL
   BROKERS.  Where plaintiffs, real estate brokers, asked defendant
   realty owner for the terms upon which he would sell, he answer-
   ing, but giving them no exclusive agency, and thereafter the
   owner, upon the request of another broker, likewise gave him
   quotations, and he succeeded in effecting a sale of the property,
   the owner paying a commission thereon, the owner was not
   liable to plaintiffs for a commission, since where several brokers
   are openly employed, the entire duty of the seller is performed
   by remaining neutral between them, and he may sell to a buyer
   produced by any of them without being called upon to decide
   at his peril between the several brokers as to which was the
   primary cause of the purchase.  (Page 483.)

Appeal from District Court, Third District; Hon. *T. D.
Lewis,* Judge.

Action by L. H. Young and J. A. Young, partners as Young
& Young, against E. A. Whitaker.

Judgment for defendant.  Plaintiffs appeal.

AFFIRMED.

*Young & Moyle* for appellants.

*Pierce, Critchlow & Barrette* for respondent.

FRICK, J.

The plaintiffs brought this action in June, 1909, to recover
the sum of $1,262.50 as a commission which they alleged was
owing them by the defendant for procuring a purchaser who
was able and willing to purchase certain real estate owned by
the defendant.  After making the necessary allegations of in-
ducement, and that the plaintiffs were duly authorized by the

defendant to sell certain real property in Salt Lake City, describing it, owned by the defendant, the plaintiffs in their complaint alleged:

"That plaintiffs undertook to sell said property for defendant in accordance with said authority and agreement, and on or about May 5, 1909, plaintiffs procured a purchaser for said property, able and willing to buy the same upon the terms above mentioned, and fully complied with all the conditions required by defendant to be performed by plaintiffs in regard thereto."

The plaintiffs therefore prayed judgment for said sum of $1,262.50. The defendant being a nonresident of the state of Utah, and absent therefrom, being a resident of East Oakland, Cal., the action was commenced by attachment. The defendant appeared and answered the foregoing complaint, admitting that in the month of April, 1909, he was the owner of the property described in the complaint, but denied that after the 25th day of said month he was—

"the unqualified owner of said property, or in the unqualified possession thereof, and that at no time after said date did he have the unqualified right of disposition thereof, all of which was well known to plaintiff."

The defendant, in effect, denied all other allegations of the complaint. The case was tried to the court without a jury on the first days of November, 1911. After the trial had been concluded, the plaintiffs, over defendant's objections, obtained leave to file, and did file, an amended complaint, in which they set forth an additional cause of action, alleging, in effect, that through their efforts the property had been sold to the purchaser, and for that reason they were entitled to receive the aforesaid sum as a commission. The defendant answered the amended complaint, and in effect denied each of the allegations therein contained, and also set up affirmative matters in defense, which need not be stated here. The court made the following findings of fact:

"(1)   That plaintiffs are, and were at all times, duly licensed real estate partners engaged in the real estate business in Salt Lake City, Utah. (2)   That in the month of April, 1909, and for a long time prior thereto, defendant was the

owner and in possession of a certain piece of property   *   * * known as No. 124 South Main street; but at no time after April 25, 1909, was he the unqualified owner of said property, or in the unqualified possession thereof, and at no time after said date did he have the unqualified right of disposition thereof—all of which facts were known to plaintiffs. (3) That during the years 1908 and 1909, defendant was residing in East Oakland in the state of California. That in response to letters written by plaintiffs to defendant, requesting defendant to state the price at which he would sell said real estate, defendant did, on or about December 10, 1908, and again on or about February 2, 1909, write to plaintiffs that he would sell said premises for $48,000, one-half cash and the balance to be secured by mortgage, deferred payments to draw interest at 6 per cent.; this price to include the regular real estate commission. That the real estate market in Salt Lake City was active from those dates until the 22d day of April, 1910, and for some time thereafter, but plaintiffs made no sale of said property up to the latter date, but did, on said later date, make a counter offer to defendant, and did endeavor to get defendant to sell said property at the price of $45,000, being $3,000 less than defendant's price on said property, and again on the 29th day of April, 1910, did make another counter offer to defendant, and did offer to give defendant $50 for a 10 days' option on said property. (4) That the price quoted to plaintiffs by defendant, and any authority to sell said premises under such quotation, was not an exclusive price or an exclusive authority, which fact plaintiffs knew. That defendant had, early in the year 1909, at the request by letter of one A. C. Sadler, who was then a regularly licensed and active real estate agent in Salt Lake City, Utah, written to said A. C. Sadler, quoting him a price upon said property, which price so quoted to said Sadler was the same price for said real property as that quoted to plaintiffs, to wit, $48,000. (5) That on or about April 25, 1909, said A. C. Sadler effected a sale of said real estate at the defendant's price of $48,-000, which sale was thereafter carried out by defendant. (6) That the said sale was made to Poulton, Madsen, Owen & Co., a corporation, which company thereafter transferred its con-

tract of purchase to George Romney & Sons Company, a corporation, to which latter company the deed for said property was executed and delivered, and by whom the mortgage to secure the balance of the purchase price was executed and delivered.   (7) That plaintiffs had offered the said property to said Poulton, Madsen, Owen & Co., and had attempted to negotiate a sale of said property to that company, as well as to a number of other possible purchasers, but had never effected a sale of said property, either to said Poulton, Madsen, Owen & Co., or to any other person, and plaintiffs were not the efficient or moving cause of making the sale to said Poulton, Madsen Owen & Co., or of procuring said company as a purchaser. That the said real estate agent A. C. Sadler, was the efficient and moving cause of making the sale to that company, and of procuring that company as a purchaser. That the said Sadler, in negotiating with said Polton, Madsen, Owen & Co. for the sale of said property to said company, acted independently of the said plaintiffs, and upon his own intiative.   That plaintiffs were not the first to bring the attention of said company to said property, or to the fact that defendant would sell the said property; but after the said company had had its attention brought by other persons to the said property, and to the fact that the property was for sale, and had become interested therein, then the plaintiffs did procure information with regard to the property, the terms and duration of an existing lease thereon, and the terms of sale, and they were the first to endeavor to sell the said property to said company.   (8) That the defendant paid said Sadler the regular real estate commission for making the said sale, $1,262.50, and has not paid the plaintiffs said or any other sum.   (10)   That plaintiffs did not procure a purchaser for said property prior to said sale made by said Sadler, and notice to them of said Sadler's sale, and did not at any time procure a purchaser within the time or terms of defendant's offer.   (11)   Defendant acted impartially as between plaintiffs and said Sadler, and there is nothing due plaintiffs from defendant.''

The court made conclusions of law upon the foregoing findings of fact, and entered judgment in favor of the defendant, from which the plaintiffs appeal.   Counsel for appellants, in

their brief, stated the question presented on this appeal in the following words:

"Appellants rely on their specification of errors set forth in the abstract at pages 52 to 54, and the errors may all be considered under the general assignment that the court erred in finding the issues in favor of respondent and against appellants, and in finding that Mr. Sadler was the procuring cause of the sale made, and that appellants were not the procuring cause. There is no evidence to support any such findings * * * *"

We have set forth the findings in full to show just upon what facts the court based its conclusion and judgment, and further to show that the court had very fully considered and found the facts upon every possible phase of the case. The evidence, to a very large extent, was documentary, consisting of letters and telegrams passing between plaintiffs and the defendant, and between A. C. Sadler and the defendant. As to that evidence there was no conflict. There was, however, some conflict in the oral evidence which the court heard in connection with said documentary evidence. The case being a law case, however, it was the exclusive province of the trial court to determine the weight that should be given to the statements of any witness or witnesses and, in case of conflicting statements, to determine which one of the witnesses should be given credence. It is conceded upon all sides that the facts of this case are somewhat different from what they usually are in such cases. Very briefly stated, the controlling facts are: That plaintiffs and one A. C. Sadler were real estate brokers in Salt Lake City. The defendant was a resident of East Oakland, Cal., and was the owner of certain real estate in Salt Lake City. On the 7th day of December, 1908, the plaintiffs wrote the defendant, asking him to give them his best price on the property in question, stating that they had a purchaser therefor "if they could give the right kind of a price." On December 10th the defendant wrote plaintiffs, stating that he would sell the property for $48,000 "including a regular commission." Nothing came of this, and on January 28, 1909, plaintiffs again wrote the defendant, asking him whether they were still at liberty to sell

at the price of $48,000 and asked what amount he would take as the "lowest first payment." Defendant, on February 2d following, answered that he would sell the property for $48,-000 "with regular commission." One-half cash and 6 per cent. interest on deferred payments. Again nothing came of this, and on March 29, 1909, plaintiffs again wrote defendant, advising him that a party—"has just told us that he has $12,-000 cash, and if you would consider a proposition of four payments made annually, with interest at 6 per cent., he believes he would take it" [the property in question].

On April 2d following, the defendant wrote plaintiffs, declining their proposition of March 29th, and advised them that he had given—

"a party my price and with the conditions they suggested in their last letter; unless the client he has should change his mind. I should hear from them in the next few days one way or the other. Of course I feel it a duty to give them time to answer. My last letter to them was sent the same day you wrote me, March 29."

On April 22, 1909, plaintiffs wired defendant thus:

"Are offered $30,000. Cash $15,000. Two years five per cent."

Defendant answered:

"Will not accept offer of $45,000.00."

On April 29, 1909, plaintiffs wired defendant as follows:

"Will give $50.00 on purchase price of $48,000.00  *  *  * to be forfeited if deal is not made within ten days."

To this defendant answered:

"Your wire of the 29th came duly to hand. In answer will say a party has placed a deposit on the price you offered. Of course the deal may not go through. I expect to and will give them a reasonable time to get their funds in."

On April 30, 1909, plaintiffs wired defendant:

"Have sold your Main Street property for forty-eight thousand. Pro rate taxes ten days from receipt of abstract for examination of title. One-half cash, balance two years at six per cent. Answer our expense."

Defendant on said day answered as follows:

"Property sold. Await my letter of 29th."

On May 3d following, the plaintiffs again wrote the defendant a lengthy letter, in which they said:

"Your letter [of the 29th of April] makes it possible for us to still be in the race for the sale of your property, as the parties placing the deposit may fall down."

In that letter plaintiffs also asked who the parties were, and the defendant, in response to that request, on the 5th day of May, 1909, wired them as follows:

"Letter third received. Poulton-Madsen are the parties trying to buy through A. C. Sadler."

On the same day plaintiffs wired defendant:

"Positively Poulton-Madsen are our people. When does the option expire? Moyle ready to close deal. Await our letter."

Then follows a long letter from the plaintiffs to the defendant, in which they claim that they could submit proof that they had been negotiating with Poulton-Madsen, and, among other things, said:

"Mr. Poulton has spent hours in our office in the past three months trying to get a lease or buy something through us. Now Mr. Whitaker, we don't believe that this firm can raise this money and our own party is ready to pay the price on the terms submitted."

There is much more in that latter, but it is not necessary to set it forth here. Defendant answered it on May 10, 1909, and on the 11th, before plaintiffs received his answer, he wired them thus:

"After writing you yesterday received telegram saying money is up, deal closed."

On May 12, 1909, the plaintiffs wired defendant as follows:

"We agreed to deliver property. Client raised money. Will be embarrassed if unable to deliver. Will guarantee you free from all liability to Sadler or his clients. Are writing."

It was shown that this telegram was instigated and dictated by the "client" referred to in the telegram. On May 22, 1909, plaintiffs again wired defendant as follows:

"Reported other parties have purchased property at advanced price. Moyle is and always has been ready to close at

price and terms agreed upon. Twenty-four thousand dollars in Utah Commercial and Savings Bank, subject to your order and deed. Title demanded or litigation. Wire answer immediately.''

The defendant answered this telegram on the 23d thus:

''Sent telegram to you on the eleventh, saying deal closed. I never authorized you to accept Moyle's proposition.''

On the 24th of May, 1909, plaintiffs closed the correspondence with the following telegram to the defendant:

''We claim regular commission for procuring purchaser for Main Street property. Do you acknowledge claim? Wire answer.''

Whether defendant answered or not is not shown nor is it material.

The correspondence between defendant and A. C. Sadler by letters and telegrams was also produced at the trial. We do not give all of that correspondence even in condensed form. Mr. Sadler, like the plaintiffs, also importuned the defendant to give the former leave to sell the property to a prospective purchaser which he had in view. This letter was dated March 13, 1909, and the defendant answered it on the 16th of the same month by giving Mr. Sadler the same price and terms he had given the plaintiffs in answer to their request. Considerable correspondence ensued between Sadler and the defendant. On April 19, 1909, Sadler in a letter to the defendant made him a definite proposition for the property, namely, $18,000 cash, and ''$30,000 for three to five years,'' and asked for the best rate of interest. On the 24th Sadler wired the defendant as follows: ''Wire my expense answer to proposition in my letter nineteenth.'' On the 22d of April, 1909, and apparently before Sadler had received the letter when he wired on the 24th, the defendant had answered Sadler's letter of the 19th thus:

''I have your favor of the 19th inst. In reply will accept $18,000 cash payment with a first mortgage back on same property to me for $30,000 for two years, interest at five and one-half per cent. per annum. All taxes to be paid by the buyer after transfer.''

To this Sadler answered by wire on April 25, 1909, as follows:

"Proposition of the 22d accepted. Five hundred dollars received to bind bargain. Wire acceptance."

There was some additional correspondence between Sadler and the defendant, and the deal was finally consummated upon the terms before stated on May 24, 1909, when the deed was forwarded by the defendant and the money paid, and the whole matter closed up. Some time was required to straighten out some technical defects in the title. It was also shown that neither the plaintiffs nor Mr. Sadler directed the purchaser's attention to the property in question. Both the plaintiffs and Mr. Sadler were informed by a third person that the purchaser thought favorably of buying the property in question if satisfactory terms and price could be made with the defendant. Upon the information given plaintiffs by such third person that "Poulton-Madsen" desired to purchase the property in question if some one could obtain a satisfactory price and terms from the defendant, they volunteered to make an attempt to obtain the lowest price and terms from him for said firm. The same is also true with respect to Mr. Sadler. All of them, therefore, were drawn into the matter to aid "Poulton-Madsen," the ultimate purchaser, rather than the defendant. The fact, however, is that Poulton, Madsen, Owen & Co. were in fact only the nominal purchasers, as all the money that firm put into the property was $2,500 the $500 which was put up as a forfeit, and $2,000 in addition. The Romneys, under a special agreement with Poulton, Madsen, Owen & Co., advanced that firm $15,500 to make up the $18,000 which constituted the first payment, and in consideration therefor said firm agreed that the Romneys should take the title and execute the $30,000 mortgage, and in case that firm paid to the Romneys, at any time within 10 years, a premium of $9,500 (less the amount advanced by said firm), then the title should pass to said firm, otherwise it would remain in the Romneys. It was through the instigation of Sadler with the aid of one of the Romneys, a young man, that the Romneys were interested and induced to advance the money to purchase the property. In consideration of young Romney's help in procuring the

money, Sadler agreed to, and did, divide the commissions received from the defendant with the young man. It is manifest, therefore, that Poulton, Madsen, Owen & Co., could not and would not have purchased the property from plaintiffs unless they had been able to obtain the money through Sadler's help from the Romneys. It was through the efforts of Sadler, therefore, and not through those of the plaintiffs, that the sale of the property was ultimately effected. The court's findings are therefore sustained by at least some substantial evidence that:

"Plaintiffs were not the efficient and moving cause of making this sale to said Poulton, Madsen, Owen & Co., or of procuring said company as a purchaser."

And also:

"That A. C. Sadler was the efficient and moving cause of making the sale to that company and of procuring that company as a purchaser."

Notwithstanding the foregoing facts, however, plaintiff's counsel insist that the judgment is contrary to law. The law which counsel contend controls this case, they say, is stated by the Supreme Court of Nebraska in the second headnote preceding the decision of *Lewis* v. *McDonald,* 83 Neb. 694, 120 N. W. 207. The headnote in question which controls the decisions in Nebraska reads as follows:

"As between two brokers, through each of whom negotiations for the sale of land were made with a prospective purchaser, he who can show that his agency was the effective cause of the sale is entitled to recover the broker's commission." .

Counsel further contend that the following statement, taken from the opinion in that case, correctly states the law applicable to the case at bar, namely:

"As between two brokers, he is entitled to recover who can show that his efforts resulted in the sale of the land. If the sale is the result of efforts exercised by both brokers, the rule seems to be that the one who first brought the seller and purchaser together is entitled to the commission. By bringing the seller and purchaser together we do not mean necessarily that he must introduce them to each other, but that, if his efforts result in bringing the minds of the two to an agreement resulting in the sale and purchase of the land, then, within the meaning of the law, he has brought them together."

The following cases are cited as supporting the foregoing statement of the law, and are all relied on by counsel: *Butler* v. *Kennard*, 23 Neb. 357, 36 N. W. 579; *Holland* v. *Vinson*, 124 Mo. App. 417, 101 S. W. 1131; *McCormick* v. *Henderson*, 100 Mo. App. 647, 75 S. W. 171; *Peckham* v. *Ashhurst*, 18 R. I. 376, 28 Atl. 337; *Hovey* v. *Aaron*, 133 Mo. App. 573, 113 S. W. 718; *Hogan* v. *Slade*, 98 Mo. App. 44, 71 S. W. 1104; *Beougher* v. *Clark*, 81 Kan. 250, 106 Pac. 39, 27 L. R. A. (N. S.) 198; *Jennings* v. *Trummer*, 52 Or. 149, 96 Pac. 874, 23 L. R. A. (N. S.) 164, 132 Am. St. Rep. 680; *Gregory* v. *Kennedy Bros.*, 82 Kan. 565, 109 Pac. 400.

The writer is not prepared to concede all that is said in all of the foregoing cases to be the law, but he concedes that all of them support the opinion as it is laid down by the Supreme Court of Nebraska in the case quoted from. It is also conceded that all of the cases cited are clearly decided right upon facts there stated. We are of the opinion, however, that the facts in the case at bar clearly distinguish it from all the cases we have just cited, and from all others referred to by plaintiffs' counsel. The case at bar, we think, comes squarely within the principle laid down by the Supreme Court of Washington, in the case of *Dalke* v. *Sivyer*, 56 Wash. 462, 105 Pac. 1031, 27 L. R. A. (N. S.) 195, and cases there cited. That case is annotated in 27 L. R. A. (N. S.) 195, *supra*, and we refer the reader to the cases cited by the annotator in the notes. In *Dalke* v. *Sivyer*, *supra*, after stating the general rule substantially as it is stated by the Supreme Court of Nebraska, in the case quoted from, the court, in the course of the opinion, says:

"It is also well settled that where an owner or agent lists property with different brokers for sale, the contract, not being exclusive the brokers run a race in energy for the prize, viz., the commission; that they enter into a competition in this respect, and that no matter how much effort or time a broker may have expended in attempting to make a sale, he cannot complain if his competitor reaches the goal before he does by securing a purchaser who is ready, able, and willing to purchase."

Counsel also cite and rely on the following case from the Supreme Court of Tennessee, to wit: *Glascock* v. *Vanfleet*,

100 Tenn. 603, 46 S. W. 449, where the rule is stated in the headnote in the following words:

> "Where real estate is placed in the hands of several brokers for sale, who act independently of each other, the one who first completes the sale is entitled to the commission, though another broker had first informed the purchaser of the property, quoted figures on it, and consented to submit to the owners any offer above a certain sum, but had not notified either the owners or the broker effecting the sale of the possible purchaser."

In *Vreeland* v. *Vetterlein*, 33 N. J. Law, 247, the decision is reflected in the following headnote:

> "Where several brokers are openly employed, the entire duty of the seller is performed by remaining neutral between them, and he has the right to make the sale to a buyer produced by any of them, without being called upon to decide between the several agents as to which of them was the primary cause of the purchase."

To the same effect are *Francis* v. *Eddy*, 49 Minn. 447, 52 N. W. 42; *Platt* v. *Johr*, 9 Ind. App. 58, 36 N. E. 294; *Scott* v. *Lloyd*, 19 Colo. 401, 35 Pac. 733. Where, as in the case at bar, the brokers apply to the seller for authority to sell property to a purchaser they have in view, and the owner grants them permission to sell, and acts in perfect good faith in selling the property to a purchaser produced by one of the brokers, we cannot see under what rule of law or justice the owner may not safely pay the commission to the one who in fact produced the purchaser. We further think that he is not required to first determine just what the other broker may have done in trying to effect a sale to the actual purchaser. If such is not the law, then as against the owner of property the broker who first obtains the authority to sell, in legal effect, always has an exclusive right, at least as against the owner of the property, and the owner is never safe in selling through another broker unless such owner is prepared to show that the first broker's efforts had no effect whatever in inducing the real purchaser to buy the property. This, in our judgment, is not the law. While it is true that when the owner authorizes more than one broker to sell his property, he must act in perfect good faith and with strict impartially in making a sale, yet where as here it is clearly understood by the broker

suing for the commission that another broker was also authorized to sell the property and was negotiating to do so, then, in our judgment, the law, as it is stated in *Vreeland* v. *Vetterlein, supra,* controls. For the reasons already pointed out, the facts in the case at bar are even stronger against the plaintiffs than is required by the ruling in *Vreeland* v. *Vetterlein.* Here the plaintiffs at no time before the property was actually sold produced a purchaser that was able to purchase for the price and upon the terms required by the defendant. Poulton, Madsen, Owen & Co. certainly were not able to purchase until the Romneys provided the funds, and they were induced to provide them, not through anything plaintiffs did, nor through any efforts they made, but through those of young Romney and Mr. Sadler. Plaintiff's claim, so far as the sale to that firm is concerned, must therefore fail, and for stronger reasons than those stated in *Vreeland* v. *Vetterlein, supra.* But, say plaintiffs' counsel, if no recovery can be had on the sale made to Poulton, Madsen, Owen & Co., yet under the law plaintiffs ought to recover because they interested Mr. Moyle in the property, and that the evidence is conclusive that he was able, ready, and willing to purchase at the price and upon the terms and conditions demanded by the defendant. A complete answer to that claim is that plaintiffs did not produce Mr. Moyle until after the offer made by Mr. Sadler had been accepted by the defendant. Surely the defendant was not required to hold the property until the plaintiffs could find some one who was able, ready, and willing to purchase. The defendant had a right to sell at any time, subject, it is true, to plaintiffs' rights in the premises. But as plaintiffs had no special rights since they did not have the exclusive right to sell, the defendant acted well within his rights when he accepted Sadler's offer, which was in fact made and accepted before Mr. Moyle's offer to purchase was made.

We are of the opinion, therefore, that, in view of the facts and circumstances of this case, the judgment of the district court is right, and it accordingly is affirmed, with costs to respondent.

STRAUP, C. J., and McCARTY, J., concur.