No. 12,697.

CONWAY-BOGUE REALTY AND INVESTMENT COMPANY ET AL.
v. BURCH ET AL.

(27 P. [2d] 500)

Decided November 13, 1933.  Rehearing denied December 4, 1933.

Mr. J. F. LITTLE, for plaintiffs in error.

Mr. HARRY A. FEDER, for defendants in error.

*In Department.*

MR. JUSTICE BUTLER delivered the opinion of the court.

JOHN T. Burch and Donald J. Burch, copartners as Burch and Son Realty Company, called herein the plaintiffs, obtained a judgment against the Conway-Bogue Realty and Investment Company and the Berkshire Investment Company, called herein the defendants.  The defendants seek a reversal of the judgment.

The evidence tends to show the following facts: The defendants owned property in Denver, known as 1255 Dexter street and the adjoining property known as 1261. The properties were for sale, and the Conway-Bogue Company's "for sale" sign was on each of the properties. The plaintiffs are real estate agents, and during the time involved herein one Latimer was their sales agent. The plaintiffs obtained a "listing" of 1261 for sale for $6,800. They admit that they did not have the exclusive agency. About the 20th of December, 1929, Latimer, knowing that one Bigelow had land that he wished to trade for a house, showed him a house in the 700 block on Bellaire street and also 1255 Dexter street. Latimer testified that they then went next door to 1261; that the door was locked and they could not get inside; that he showed Bigelow the decorations from the outside and told him that "the bed rooms were smaller, and it had a breakfast room like the other one in the 700 block," and that the price was $6,800; and that Bigelow said that the first chance he got he would bring his wife out to see the house, and if she liked it he would come in and talk to Latimer. That was the sum and substance of Latimer's activity in the matter. He made no further effort to sell the property. He did not even inform the defendants that Bigelow was a prospective purchaser or that he (Latimer) had shown the property to him. Latimer testified: "Q. You are coming in here claiming a commission for showing this house once to Mr. Bigelow, aren't you? A. Yes. Q. You never got a proposition or offer from him of any kind? A. No, I never got any offer or proposition. I never had a chance to. Mr. Zimmerman was already dealing with him as soon as he showed it to his wife." Bigelow, called as a witness by the plaintiffs and afterwards by the defendants, testified that the inspection he made at the time "was only from the sidewalk, in the car." He testified also: "I told Mr. Latimer I liked the house. We discussed it in a general way. I asked him what kind of a deal he

thought he could get me. My recollection of the case is this: That he told me the property was so involved that he couldn't give me a deal at that time. No price was mentioned. * * * The impression I gained from Mr. Latimer was to the effect that the property was so heavily involved with mortgages, liens, etc., that we couldn't make a deal on the property. * * * After I had talked to Mr. Latimer and he told me there were so many judgments on the property that it was inadvisable to deal he did nothing further to induce me to purchase that property. He did not show me the property, he did not talk about it. I suppose I saw him two or three times just for a matter of saying hello to him after that. He did not mention the property after that. * * * After Mr. Latimer told me that the property was involved and intimated I had better not deal with it, he did not talk to me afterwards. He did not do anything to endeavor to sell that property to me after that time." Latimer testified that Bigelow must have misunderstood what was said about the liens; that he told Bigelow that they had been cleaned up so the property could be sold. As a matter of fact, as will appear further on, they had not been cleaned up. Assuming that the verdict establishes the fact that Latimer said that the encumbrances had been cleaned up, Bigelow did not understand it that way, and his understanding has a bearing on the question whether or not Latimer had succeeded in inducing Bigelow to consider favorably a deal for the property. About three weeks later Bigelow and his wife were out driving, and after looking at another house, he suggested that they look at the Dexter street houses. Bigelow testified: "I can't answer truthfully how I knew about those houses on Dexter street because I don't know at the present time. I may have seen an advertisement in the paper that morning. Again I may not. I do know that Mr. Latimer had shown those houses to me about three weeks previously." They found, at 1255, Conway-Bogue Company's sales agent, Zimmerman, who showed them through that house.

Bigelow told Zimmerman that he had a piece of land that he would exchange for "something likable," and Zimmerman agreed to take it up with the firm to see what could be done. Bigelow told him that he had been shown that house by Latimer. Later in the week Zimmerman told Bigelow that they could not make a deal on 1255, and suggested that he look at the house next door (1261) and also at a house on Birch street. The Bigelows looked at both houses, and later Zimmerman, as Bigelow testified, "then came to me with a proposition from the Berkshire Investment Company to deal for a house at 1261 Dexter street." Negotiations were carried on resulting in the exchange of Bigelow's land for that property, which was encumbered with a mortgage and a mechanic's lien. Bigelow assumed the mortgage, and the defendants furnished a bond to protect him against loss on account of the mechanic's lien. When the plaintiffs learned that the deal was or was about to be consummated, they demanded a commission. The defendants refused to pay them a commission on the ground that Zimmerman, not Latimer, was the procuring cause of the trade and was claiming a commission.

From the record it appears that no exclusive agency was given to the plaintiffs; that the property was placed in the hands of at least two agents to sell; that the defendants also reserved the right to sell and had their sign on the property; that the defendants remained neutral between the rival agents; that Zimmerman, not Latimer, was the efficient agent in bringing about negotiations between the owners and the prospective purchaser that culminated in the trade—in other words, was the efficient and procuring cause of the trade. Plaintiffs, therefore, were not entitled to a commission. *Scott v. Lloyd,* 19 Colo. 401, 35 Pac. 733; *Carper v. Sweet,* 26 Colo. 547, 59 Pac. 45. The following language in the opinion in *Scott v. Lloyd, supra,* substituting "Zimmerman" for "plaintiffs," is pertinent here: "It is beyond question that plaintiffs produced the purchaser to whom

they sold and conveyed the property, and they [the owners] were not bound to inquire what part, if any, other agents had in the transaction. They could remain neutral as between competing agents, and by paying the commission to the one who brought the purchaser to them be relieved from liability to any other.''

In that case we cited with approval *Vreeland v. Vetterlein*, 33 N. J. L. 247, where the court said: ''Where the property is openly put in the hands of more than one broker, each of such agents is aware that he is subject to the arts and chances of competition. * * * Now, in this competition, the vendor of the property is to remain neutral; he is interested only in the result. But when either of the agents thus employed brings a purchaser to him, and a bargain is struck at the required price, on what ground can he refuse to complete the bargain? Can he say to the successful competitor, this purchaser was first approached by your rival, and you should have refused to treat with him on the subject? There is no legal principle upon which such a position could rest. * * * And if, therefore, it should be known to the vendor of the property that the agent who introduces a purchaser to him has, by the usual arts of competition, taken such purchaser out of the hands of his rival, I am not aware of anything in the law which would justify such vendor in a refusal to complete the contract. * * * In the absence of all collusion on the part of the vendor, the agent, through whose instrumentality the sale is carried to completion, is entitled to the commissions.''

The verdict and judgment are unsupported by the evidence.

The judgment is reversed.

Mr. Chief Justice Adams and Mr. Justice Campbell concur.